Sylvia **BORNSTEIN**, Plaintiff,

v.

**J.C. PENNEY LIFE INSURANCE CO. dba J.C. Penney Casualty Co.,** Defendant.

No. CV 96–1829 ER (BQRx).

United States District Court, C.D. California.

Nov. 27, 1996.

Bruce N. Graham, Graham & Arkin, Encino, CA, for Plaintiff.

Stephen H. Galton, Joanna M. Eoff, Galton & Helm, Los Angeles, CA, for Defendant.

*MEMORANDUM DECISION DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

RAFEEDIE, District Judge.

The Court has read and considered defendant J.C. Penney's Motion for Summary Judgment, the opposing papers thereto, the reply, and all other matters before the Court. This matter came on for hearing on Novem-

ber 4, 1996, at 10:00 a.m. in Courtroom 1, and after oral argument the Court took the matter under submission. The Court now renders this memorandum decision.

The issue in this case is, "what is an accident." The beneficiary of an accidental death and dismemberment insurance policy and two life insurance policies all covering the same insured has claimed benefits under the policies for the death of the insured, who died during open heart surgery. The autopsy revealed that the insured had died as a result of a Cerebral Vascular Accident, commonly known as a stroke. The insurer declined to pay any benefits under the accidental death and dismemberment policy and paid only the lower non-accidental benefits under the life insurance policies, claiming that the death was not accidental.

## FACTS

These facts are undisputed. On April 3, 1991, Marvin Lerner ("Lerner") was issued certificate of insurance No. 74AB443292 from defendant J.C. Penney Life Insurance Co ("JCPLIC"). The face of the policy designates it to be "Group Accident Insurance," and "Accidental Death and Dismemberment" insurance; the Court will adhere to that designation (the "AD & D policy"). The AD & D policy contained a three-tiered plan which provided a benefit of $125,000 for death or dismemberment for injuries involving common carriers, a benefit of $50,000 for injuries involving non common carrier automobiles, and a benefit of $20,000 if "[i]njured in an accident [not due to common carrier or automobile] and ... not otherwise excluded in the policy." The AD & D policy defines "INJURED" as "having suffered an INJURY," and "INJURY" as "bodily injury caused by an accident occurring while the insurance is in force resulting: (1) within 365 days after the date of the accident; and (2) directly and independently of all other causes" in death or dismemberment. There are no other exclusions in the policy relevant to the present case.

On November 24, 1994, Lerner was issued JCPLIC group life insurance certificate No. 74LY370999, the maximum benefit under which was $2,725. On January 16, 1995, Lerner was issued another group life insurance certificate by JCPLIC, No. 74LY431873, under which the maximum benefit was $2,250. These two certificates each referred to the same master policy, and thus their terms are identical except as to their respective amounts of insurance coverage, as described *supra*. These two policies, entitled "Group Life Insurance" (the "life policies") provide:

> If you die as a result of an accident after the Certificate's Effective Date, full benefits are paid.

> Should you die within the first year of the Certificate's Effective Date, and if your death is not the result of suicide or accident ... your beneficiary will receive 130% of the first year annualized gross premium.

.   .   .   .   .

> ACCIDENTAL DEATH means death which results from accidental bodily injury directly and independently of all other causes.

.   .   .   .   .

> ACCIDENTAL DEATH does NOT include death resulting from any of the following risks which are specifically excluded:

.   .   .   .

> 6.  disease.

None of the three policies specifically defines the term "accident," the interpretation of which is central to the claims under all three policies. All three of the certificates issued under the policies contained "liberalization" clauses which differ in minor aspects of syntax having no impact on the present case, but which provide:

> This [c]ertificate supersedes any [c]ertificate previously issued [to the insured] under the policy. [Insureds] may qualify under one certificate only. If any person is insured under more than one certificate, we will consider that person to be insured under the certificate which provides the greatest amount of coverage.

Lerner, then 74 years old, was admitted to Santa Monica Hospital Medical Center on March 29, 1995, complaining of chest and

arm pains. Lerner had coronary heart disease for which he had undergone a quintuple bypass surgery in 1985. He also suffered from hypertension and other minor ailments. After some tests, Lerner was scheduled to undergo a redo coronary bypass surgery on April 18, 1995 to bypass blockages in three coronary arteries. The surgery appeared to go well, but Lerner never regained consciousness. He was found to have dilated pupils after the surgery, which was, according the surgeon's discharge summary, "very unusual." An electroencephalogram revealed few brain waves and evidence of severe ischemic injury to the cerebral cortex and brain stem. Lerner was declared brain dead and his life support was removed at his family's request on April 26, 1995, at which time he was pronounced dead.

An autopsy conducted two days after Lerner's death revealed generalized atherosclerosis and a dissecting aortic aneurysm which extended into the arteries of the neck. Lerner had extensive encephalomalacia of both cerebral hemispheres, the hypothalamus, brain stem, pons, and hemorrhages in both cerebral hemispheres. The cause of death was listed on Lerner's Death Certificate as a "cerebral vascular accident" ("CVA"), in layman's terms a "stroke."

All of three of the insurance policies at issue in this case were in force when Lerner died. On June 12, 1995, plaintiff Sylvia Bornstein, who was the plaintiff's sister and beneficiary under all of the policies, submitted a death certificate to JCPLIC along with a form claiming benefits under the two life policies. JCPLIC concluded that Lerner had died as a result of disease, which is specifically excluded from being "accidental" under the life policies, and paid the non-accidental benefit of 130% of the first year's annualized gross premiums under each policy, payments of $549.33 and $398.21, respectively.

On September 14, 1995, Lerner's nephew, Bornstein's son Barry Bornstein, called JCPLIC and demanded payment of the higher payout for accidental death under the life policies, and payment of the accidental death benefit under the AD & D policy, claiming that Lerner's death was the result of an accident.

JCPLIC performed additional investigation into the claims, but ultimately denied them. This litigation ensued in the state court, and defendant JCPLIC removed the case under Title 28 U.S.C. § 1441.

## JURISDICTION

This Court has jurisdiction over this action on the basis of diversity of citizenship pursuant to Title 28 U.S.C. § 1332, in that JCPLIC is a citizen of Vermont and Texas, and plaintiff Bornstein is a citizen of California. Though the amount sought under the breach of contract action does not exceed $50,000, plaintiff has also pled claims for bad faith breach, negligent and intentional infliction of emotional distress and fraud, which serve to bring the potential recovery within the jurisdictional amount.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists where the nonmovant presents evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. 477 U.S. at 255, 106 S.Ct. at 2513. If no genuine issue as to a material fact is raised, the Court may grant summary judgment as a matter of law. Fed.R.Civ.P. 56(c).

## CHOICE OF LAW

■ A federal district court sitting in diversity jurisdiction is to interpret and apply the substantive law of the forum state. *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties have not disputed that California is the forum state and that its law is to be applied in this

case. *See Liew v. Official Receiver & Liquidator*, 685 F.2d 1192, 1195 (9th Cir.1982).

### "ACCIDENTS"

■ The issue in this case distills down to whether Marvin Lerner died as the result of an "accident."

Plaintiff makes the common-sense yet specious argument that the fact that Lerner's death certificate lists his cause of death as a "Cerebral Vascular Accident" brings the event within the three policies' definition of the word "accident," and should therefore invoke full coverage. However, sometimes words have two meanings. The medical term cerebral vascular "accident" is not necessarily synonymous with the term "accident" as used in the insurance policies. The meaning of the term "accident" in the policies at issue in this case must be interpreted using the principles of contract interpretation, because the policies are contracts between Lerner and JCPLIC.

In interpreting a contract, the mutual intention of the parties is to be inferred, if possible, from the written agreement. The clear and explicit meaning of the terms, interpreted in their ordinary and popular sense, should control judicial interpretation, and if the meaning a layperson would ascribe to the contract language is not ambiguous, the Court should apply that meaning. *AIU Ins. Co. v. FMC Corp.*, 51 Cal.3d 807, 821–23, 274 Cal.Rptr. 820, 831–32, 799 P.2d 1253, 1264–65 (Cal.1990) (discussing the statutory principles of contract interpretation in Cal.Civil Code §§ 1636, 1638, 1639, 1644, 1649 and 1654). California courts apply certain special rules for the interpretation of insurance contracts in order to protect the objectively reasonable expectations of the insured. The insurer is held responsible for any ambiguities in the contract as the drafter of the policy, and because little bargaining over terms by the insured is possible. Therefore, ambiguous terms are construed against the insurer. Exclusions are interpreted narrowly and terms extending coverage are construed broadly. *Id.*

■ The term "accident" is not specifically defined by either of the insurance policies. Distilled to the portions relevant to this case, the AD & D policy provides coverage if the insured is "injured in an accident;" "INJURED means having suffered an injury;" and "INJURY means bodily injury caused by an accident ... directly and independently of all other causes...." This rather circular definition is entirely unhelpful in the determination of whether the circumstances of Lerner's death constitute an accident under the policy.

The terms in the life policies are slightly more helpful. They state: "[i]f you die as a result of an accident ... full benefits are paid;" "ACCIDENTAL DEATH means death which results from bodily injury directly and independently of all other causes;" and "[a]ccidental death does not include death resulting from any of the following risks which are specifically excluded: ... disease." Though the term "accident" in these policies is not specifically defined, at least the policy informs the reader what is not an "accident," specifically for purposes of the present case, death resulting from disease.

For assistance in its interpretation of the insurance contracts, the Court looks to other courts' constructions of the term "accident." The question of whether a certain set of facts describes an "accident" has plagued courts in the United States for many years, and California courts are no exception.[1] The California Supreme Court has recognized that "[n]o all-inclusive definition of the word 'accident' can be given." *Geddes & Smith, Inc. v. St. Paul–Mercury Indem. Co.*, 51 Cal.2d 558, 563–64, 334 P.2d 881 (1959). Reported California decisions appear to have settled on a working definition of the term, however. As defined by the California Supreme Court, an accident is "a casualty—something out of the usual course of events, and which happens suddenly and unexpectedly and without any design of the person injured." *Richards v. Travelers' Ins. Co.*, 89 Cal. 170, 175, 26 P.

---

1. *E.g.* Robert H. Jerry II, *Understanding Insurance Law* 326–331 (1987), Spencer L. Kimball, *Cases and Materials on Insurance Law* 257–60 (1992), 46 *C.J.S.* Insurance § 863 (1993), 39 *Cal. Jur.3d* Insurance Contracts and Coverage § 257 (1977 & 1988 supp.).

762, 763 (Cal.1891), *Rock v. Travelers' Ins. Of Hartford, Conn.,* 172 Cal. 462, 156 P. 1029 (Cal.1916), *Zuckerman v. Underwriters at Lloyd's, London,* 42 Cal.2d 460, 473, 267 P.2d 777, 781 (Cal.1954).

Furthermore, the determination of whether the injury or death was expected or intended is measured from the viewpoint of the insured at the time and in the circumstances of the potentially accidental event. "Where the death is the result of some act, but was not designed, and not anticipated by the deceased, though it be in consequence of some act voluntarily done by him, it is accidental death." *Olinsky v. Railway Mail Ass'n,* 182 Cal. 669, 189 P. 835 (Cal.1920), *Ogilvie v. Aetna Life Ins. Co. Of Hartford, Conn.,* 189 Cal. 406, 209 P. 26 (Cal.1922). "When an injury is an unexpected and unintended consequence of the insured's conduct, it may be characterized as an accident for which coverage exists. When the injury suffered is expected or intended, coverage is denied. When one expects or intends an injury to occur, there is no 'accident.'" *Automobile Club v. Flores,* 45 Cal.App.4th 661, 669, 53 Cal.Rptr.2d 18, 21 (Cal.Ct.App.1996).

The rule of law established is that if the death of the insured was objectively unexpected and unintended by the insured and happened out of the usual course of events, his death was accidental.

### COVERAGE UNDER THE AD & D AND LIFE POLICIES

■ The AD & D policy in the present case does not provide a specific exclusion for death resulting in part from disease, though it does require that the insured's death result from an accident "directly and independently of all other causes." This Court will construe the term "directly and independently of all other causes" in its most restrictive sense so as to allow for the greatest amount of coverage, as required by *AIU Ins. Co., supra.* To construe the term in a broad sense would be to narrow coverage to the point of rendering it nugatory, and would enable an insurer to point to one expected or intended factor in the chain of causation for a given event over which coverage is in issue, and

thereby defeat its reasonably expected contractual obligation.

Furthermore, even where disease is specifically excluded in the policy (as in the life policies at issue here) and is a contributing factor in the death of the insured, coverage may still be afforded. And where disease is one factor in the death of an insured, the clause "directly and independently of all other causes" will not necessarily serve to defeat the insurer's obligation to provide coverage. *Arata v. California–Western States Life Ins. Co.,* 50 Cal.App.3d 821, 123 Cal.Rptr. 631 (Cal.Ct.App.1975). In *Arata,* the deceased was insured under a life insurance policy which provided double indemnity in the event of death resulting from "accidental bodily injury, directly and independently of all other causes ... but not payable ... if death ... is contributed to by: disease...." 50 Cal. App.3d at 823, 123 Cal.Rptr. at 632. The insured was a hemophiliac who slipped and fell (accidentally, the court determined) and who bled internally until he died a few days later. The accidental fall and hemophilia were jointly causative. But for either, the insured would have survived. The court ordered the insurer to pay the double indemnity, finding that "a preexisting disease or illness although contributing to the loss resulting from the accident, does not relieve the insurer of liability where the accident is the proximate cause of death." 50 Cal. App.3d at 825, 123 Cal.Rptr. at 633.

■ JCPLIC argues that Lerner died of "natural causes," based largely on the death certificate, which lists Lerner's death as immediately caused by the CVA, secondarily due to Arteriosclerotic Heart Disease. Plaintiff hotly contests this argument, pointing out that the policy does not exclude coverage for death by "natural causes." But the policy need not make such an exclusion to coverage where the coverage afforded extends only to "accidents." Indeed, if the insured died as a result of his Arteriosclerotic Disease, whether his death so attributable is termed of "natural causes," by "disease," or by "old age" is of no consequence. The issue is whether his death was unexpected, unintended, and happening out of the usual course of events.

There is evidence that the defendant's death during the surgery might have been expected. He was a 74 year old man who had undergone a previous quintuple coronary bypass operation, and who suffered from hypertension and other ailments.

There is also quite strong evidence on the record before the court to show that the plaintiff's death may have been caused unexpectedly and without his intent, and that his death was unusual. First, the fact that Lerner underwent the surgery in the first place shows fairly conclusively that he (at least subjectively) did not intend his death to occur. Had he wished to die, he could have simply forgone the surgery and waited. Second, as plaintiff points out, the surgeon's pre and post operative reports were optimistic, which makes somewhat of a showing that Lerner's death was unexpected. There is little evidence on the record probative of whether the Lerner's death, in his condition and during the surgery, was unusual. The Court suggests that expert medical testimony would go a long way to clarifying the issue of whether the cause of Lerner's death was expected or unusual.

The evidence on the record also reveals a conflict as to the cause of Lerner's death. The Death Certificate clearly lists the cause of death as CVA, due to Arteriosclerotic Heart Disease. Arteriosclerosis is a disease in which the walls of the arteries become thick and sclerotic (less elastic). W.B. Saunders Co., *Dorland's Illustrated Medical Dictionary* 129 (28th ed. 1994). However, the autopsy report noted substantial dissection of Lerner's aorta. Aortic dissection is longitudinal splitting of the arterial wall resulting from hemorrhage. *Id.* at 496. Basically, dissection occurs where blood flows between the inner and outer walls of the artery rather than through the usual central pathway. This can cause constriction of the interior diameter of the artery, and consequent reduced blood flow through it. *See* E. Stanley Crawford, M.D., *The Diagnosis and Management of Aortic Dissection,* 264 JAMA 2537 (1990). JCPLIC's own medical consultant, Dr. Baird, hypothesized in his evaluation of Lerner's file that it appeared that Lerner "had acute dissection of lower thoracic and abdominal aorta leading to brain ischemia and death. [It a]ppears the dissection happened in the immediate post-operative period, since he was comatose after surgery/anesthesia."

This evidence leaves open certain questions. The first question is whether (1) the natural progression of Lerner's arteriosclerosis or (2) the aortal dissection primarily or proximately caused the ischemia which ultimately caused Lerner's death (or both and in what proportions), whether the dissection was unexpected and unusual. The question can be framed more broadly as whether Lerner happened to die coincidentally during the surgery, the surgery itself being causally unrelated to his death, or whether he died unexpectedly as a result of an unforseen and unusual event during, or as a result of, the surgery.

The issue which the court has been discussing in the last few paragraphs in medical terms is called in legal terms a genuine issue of material fact which is appropriate for determination by the trier of fact.

The court's conclusion is bolstered by the persuasive authority of *Fagan v. J.C. Penney Insurance Co.,* 39 Wash.App. 241, 692 P.2d 887 (1984). In *Fagan,* the insured was covered by a JCPLIC accident policy which contained language identical to that at issue here in the AD & D policy. The insured suffered from a heart arrhythmia, and underwent surgery to correct it. During the surgery, the insured's blood pressure dropped, but the doctors were able to compensate and proceed with the surgery with no other noted difficulties. The insured was expected to recover normally, but he failed to awaken and was found to be brain dead on the following day. The cause of his death was never precisely determined, but it did not appear to be the result of negligence on the part of the physicians. In a trial to the court, the trial court found that the death was "unforseen and unexpected." The court of appeals affirmed, stating:

Despite the fact that his surgical actions were done in a deliberate and intentional manner, there was no evidence that the surgeon caused cerebral ischemia with "design, intent or obvious motivation."....

Therefore, we conclude that a factfinder could indeed have found that the cerebral ischemia constituted an unexpected and unforseen event.... Accordingly, the trial court properly concluded that Mr. Fagan suffered an "accidental" death as contemplated by the terms of the insurance policy.

39 Wash.App. at 245, 692 P.2d at 889–90 (footnotes and citations omitted). *Fagan,* though persuasive authority only, comports nicely with this Court's holding in the present case that there are genuine issues of fact remaining in the case, issues which should properly be submitted to a finder of fact.

## BAD FAITH AND OTHER CLAIMS

■ Having determined that coverage is still in issue, the Court finds that plaintiff's claims for breach of the duty of good faith and fair dealing, negligent and intentional infliction of emotional distress and fraud may go forward. Plaintiff has raised genuine issues as to the reasonableness of JCPLIC's investigation of plaintiff's claims. Furthermore, the Court notes that because JCPLIC was a *party* to the *Fagan* case, which involved what appears to be the exact same policy as is at issue here, it's decision to deny coverage under the *remarkably* similar facts of the present case certainly creates a question in the Court's mind as to whether the denial was in good faith.

## LIBERALIZATION CLAUSE

■ The Court is able to dispose of one issue as a matter of law on summary judgment. Plaintiff points to the "liberalization clause" contained in each of the certificates of insurance issued to Lerner which provided that if an insured had more than one certificate under the policy, the extent of coverage under the policy was to be assessed under the policy providing the greatest amount of coverage. Plaintiff argues that this clause means that the "disease" exclusion should thereby be omitted from the life policies, because there is no such exclusion in the AD & D policy, and that therefore coverage should be assessed under that policy, because the coverage afforded is greater.

But the language in the liberalization clause clearly does not bear out plaintiff's tortured interpretation. The clause reads that the certificate "superseded any Certificate previously issued to you under *the policy*." (Emphasis added.) Plaintiff's argument, in essence, is that the words "the policy" refer to any policy of insurance issued by JCPLIC, regardless of whether it is an automobile policy, a homeowner's policy, or a commercial general liability policy. The language of the clause clearly refers to multiple certificates issued under the same master policy of insurance, or at least if the specific master policy numbers are different, to the same *type* of insurance. This interpretation not only comports with the language of the clause, but also protects the reasonable expectations of the insured; that is, no insured purchases a life insurance policy expecting coverage to be extended through a liberalization clause to entirely different forms of insurance.

■ Plaintiff argues that Title 10, Cal.Admin.Code § 2232.33(b) applies to the three policies at issue in the present case. Section 2232.33(b) states that it is not appropriate for a group disability policy issued by an insurer to limit coverage under multiple policies sold to the same insured to that extent provided under any one given policy of those policies sold to the insured by the insurer. The problem with the argument is that only one of the policies at issue in this case is governed by the administrative regulation. Cal. Ins.Code § 106 defines disability insurance as "insurance appertaining to injury, disablement or death resulting to the insured from accidents...." Life insurance is separately defined in Cal.Ins.Code § 101 as "insurance on the lives of persons or appertaining thereto...." Therefore, the regulation which plaintiff claims governs all three of the policies at issue in this case really only applies to the AD & D policy, of which there is only one, which does therefore not invoke § 2232.33 governing instances of *multiple* group disability policies.

## CONCLUSION

Except for the issue of the application of the liberalization clause found in the policies

and the effect on it of Title 10 Cal.Admin Code § 2232.33, the Court finds that genuine issues of material fact remain to be tried. Defendant's Motion for Summary Judgment is therefore DENIED.

IT IS SO ORDERED.